**UNITED STATES of America, Plaintiff,**

v.

**Yacoub NAKHOUL, Antonious Tannous, and Milad El-DeBeib, Defendants.**

**Crim. No. 84–217–C.**

United States District Court,
D. Massachusetts.

Oct. 31, 1984.

---

Sydney E. Hanlon, U.S. Atty., for plaintiff.

Walter B. Prince, Brown & Prince, Boston, Mass., for Mahomud Rawwad.

Philip Nessralla, Brockton, Mass., John C. McBride, Boston, Mass., for Assad Abou-Saada.

Karnig Boyajian, Boston, Mass., for Milad El-DeBeib.

Jonathan Shapiro, Stern & Shapiro, Boston, Mass., for Yacoub Nakhoul.

Nicholas Abraham, Daniel Sherwood, Boston, Mass., for Antonious Tannous.

Francis Dimento, Dimento & Sullivan, Boston, Mass., for Yacoub Fayad.

## MEMORANDUM RE: MOTIONS TO SUPPRESS

CAFFREY, Chief Judge.

Defendants Yacoub Nakhoul, Milad El-DeBeib, and Antonious Tannous have been indicted for conspiracy to possess heroin with intent to distribute (21 U.S.C. § 846). The case is now before the Court on motions to suppress the post-arrest statements of these three defendants.

*Defendant Nakhoul*

It is uncontroverted that Yacoub Nakhoul was arrested in Cambridge, Massachusetts, shortly after 4:00 p.m. on May 31, 1984. He was then transported to Drug Enforcement Administration ("DEA") headquarters in Boston in a government vehicle operated by DEA Agent Venizelos. Customs agent MacDonald was present in the vehicle, as well as Milad El-Debeib, who was also under arrest. Upon arrival at DEA headquarters Nakhoul was placed in a holding cell and subsequently questioned by DEA agents Murphy and Reilley. Nakhoul's motion to suppress challenges the admissibility of post arrest statements made both in the government vehicle immediately following arrest and later at DEA headquarters.

At the suppression hearing Agent Venizelos testified that he advised Nakhoul of certain rights by reading them aloud from a card entitled "DEA form 13A" while he, Nakhoul, MacDonald and El-Debeib were seated in the vehicle at the arrest scene. Agent Venizelos produced and read this card in court: the rights as recited are adequate to satisfy the requirements of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Venizelos further testified that after he read each portion of the *Miranda* warnings he paused and asked Nakhoul if he understood. According to Agent Venizelos, Nakhoul responded affirmatively each time by nodding his head or saying "yes." Agent MacDonald corroborated Venizelos testimony, saying that he also had asked Nakhoul if he understood his rights, and had received an affirmative response. Neither agent claimed that Nakhoul made an express waiver of his right to remain silent or his right to an attorney.

Both agents testified that they had conversation with Nakhoul, conducted entirely in English. Venizelos testified that Nakhoul, together with El-DeBeib, gave him advice as to the best route back to Boston. MacDonald testified that he asked Nakhoul what he was doing at the Holiday Inn, and that Nakhoul responded that he went there to have El-DeBeib look at a broken taxi meter. Despite the minor inconsistencies in the agents' testimony brought out on cross examination, I find that their testimony is credible as to the advisal of rights and the occurrence of conversations in the vehicle.

Upon arrival at DEA headquarters, Nakhoul was placed in a holding cell prior to questioning by agents Reilley and Murphy. Agent Venizelos' testified that approximately one hour elapsed between the time he advised Nakhoul of his rights and the time Agents Reilley and Murphy entered the cell, and Agent MacDonald said that the time elapsed was 45 minutes to one hour. Agent Reilley, however, testified that as much as an hour and a half may have passed between the time of arrest and the interrogation. Given Officer Venizelos' own testimony that the arrests took 10–15 minutes at the scene, and that the ride from Cambridge took 35–40 minutes, I find

that Agent Reilley's estimate of the time is more credible.

Agent Reilley described the holding cell as a small room with no windows, a heavy door, and a bench for the prisoner to sit on. He and Agent Murphy entered the cell, did not advise Nakhoul of his *Miranda* rights, and proceeded to question him. Both agents testified that Nakhoul was visibly upset and wept during questioning.

Again, the questioning was conducted entirely in English. At one point during the interrogation Agent Murphy told Nakhoul that he did not believe him, and later told Nakhoul that it would be in his benefit to cooperate. According to Murphy, both he and Reilley asked a series of questions of Nakhoul.

■ At issue in Defendant Nakhoul's motion is the adequacy of the *Miranda* warning. It is well established that the failure of questioning officers to obtain an explicit waiver of rights does not necessarily require suppression of post-arrest statements. *North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). While silence alone does not constitute waiver, silence coupled with an understanding of one's rights and a course of conduct indicating waiver permits the conclusion that waiver has occurred. *Id.* at 373, 99 S.Ct. at 1757. There is, of course, a heavy burden on the government to "demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to . . . counsel." *Miranda v. Arizona*, 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966), *citing Escobedo v. Illinois*, 378 U.S. 478, 490 n. 14, 84 S.Ct. 1758, 1764 n. 14, 12 L.Ed.2d 977 (1964). To determine whether a valid waiver has been obtained, a court should consider all the circumstances surrounding the interrogation, including the defendants' age, experience, education, background, and intelligence. *E.g. Fare v. Michael*, 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979).

Here, there was credible testimony that Defendant Nakhoul was a cab driver who gave the arresting agents advice as to travel routes between Cambridge and Boston.

From this one may infer that Nakhoul is an adult capable of passing a drivers test and conducting business with his passengers. In addition, four agents testified that they had conversation with Nakhoul in English, and that he gave responsive answers to their questions. Nakhoul also indicated, when asked, that he understood his rights. In this respect, the case before the court differs from *Tague v. Louisiana*, 444 U.S. 469, 100 S.Ct. 652, 62 L.Ed.2d 622 (1980), where the prosecution failed to introduce any evidence that the defendant acknowledged understanding of his rights. On the evidence presented, I rule that defendant Nakhoul was informed of his rights, understood them, and was capable of waiver.

■ Aside from that degree of coercion inherent in any arrest, the conduct of officers Benizelos and MacDonald was neither threatening nor overbearing. In fact, from the agents' testimony that Nakhoul gave them road directions, it appears that the atmosphere in the vehicle was congenial. As noted, there was no express waiver of rights by Nakhoul. He merely acknowledged his understanding and then answered questions. On the other hand, he did not invoke his right to an attorney or his right to remain silent. *Contra United States v. Christian*, 571 F.2d 64 (1st Cir. 1978), *United States v. Montgomery*, 714 U.S. 201 (1st Cir.1983). Therefore, in accordance with *Butler*, I find that defendant Nakhoul's conduct indicates that he knowingly and intelligently waived his rights, and that defendant's motion to suppress be denied as to statements made to agents Venizelos and MacDonald in the vehicle. *United States v. Velasquez*, 626 F.2d 314 (3rd Cir.1980), *United States v. Stark*, 609 F.2d 271 (6th Cir.1979).

■ Upon arrival at the DEA headquarters, however, the circumstances of the interrogation changed. The defendant was locked up, alone, in a small windowless room for a period of time and then questioned by two unfamiliar agents. It is significant that agents Reilley and Murphy did not give *Miranda* warnings themselves and were not present when agent Venizelos gave the warnings some time earlier. De-

fendant Nakhoul may not have realized that he could assert his rights with the agents who questioned him in the cell, particularly in the light of his changed circumstances. Furthermore, agents Reilley and Murphy used a more aggressive style of interrogation than Nakhoul had experienced earlier. This is not *per se* offensive to Fifth Amendment rights, but may be a factor in determining whether Nakhoul's conduct indicated that he effectively waived those rights. *Fare v. Michael*, 442 U.S. at 727, 99 S.Ct. at 2573. The government's contention of waiver is further undercut by testimony that Nakhoul was upset, frightened, and weeping during the interrogations.

 *Butler* teaches that a subject's background should be considered when applying this "totality of circumstances" test. 441 U.S. at 373, 99 S.Ct. at 1757. Nakhoul is a Lebanese national living in this country. It is reasonable to infer that his understanding of American law, customs, and constitutional rights may be limited. The government has overcome this inference as to conversations which took place in the vehicle through a showing that Nakhoul's rights were read to him, and that he acknowledged his understanding of those rights. There has been no showing that Nakhoul understood that those same rights could be asserted during questioning by any law enforcement officer. In other words, warnings adequate to dispell the coercion inherent in the first custodial situation were not sufficient in light of the changed circumstances at the DEA office. Consequently, I rule that those statements made by defendant Nakhoul at the DEA office be suppressed.

*Defendant Tannous*

██ Antonious Tannous was arrested on Memorial Drive in Cambridge, Massachusetts by Agent Connolly of DEA and Customs Agents Protentis and Madden. Tannous was placed in a government vehicle operated by Agent Protentis in which Agent Madden was also a passenger. At issue in defendant Tannous' motion is the admissibility of statements made during the ride to Boston and later at DEA headquarters with the assistance of a translator.

Agent Protentis testified that while in the car Agent Madden gave Tannous the required *Miranda* warnings, that Madden paused after each warning, and that Tannous indicated his understanding of each right. That the rights were, in fact, read to Tannous is undisputed. Rather, the issue centers on Tannous' understanding of the rights read to him, premised on his claimed unfamiliarity with English and low intelligence.

Defendant Tannous himself took the witness stand, testifying at first through an interpreter supplied by defense counsel. Tannous' testimony was replete with evasive and unresponsive answers despite repetition of the questions by two interpreters. Significantly, he was particularly uncooperative where the questions called for answers unfavorable to him, thereby discrediting his claims of inferior intelligence.

One line of questioning was particularly telling. On direct examination, Tannous first testified that he did not understand anything that was said by the agents in the car. On cross, he admitted telling the agents that he was going to pick up his daughter, that he was from Lebanon, and that he had a green card. When asked if this conversation took place in English or Arabic, Tannous engaged in a colloquy with the interpreter. The court ordered another interpreter sworn and the question put to Tannous again. Tannous repeatedly failed to answer the question, then reverted to his original testimony that he had told the agents nothing.

Agent Protentis, on the other hand, testified that he had substantial conversation with Tannous, ranging from discussion of events relevant to the case to common back ailments. He further testified that Tannous said "he wanted to tell the truth" when the agents began questioning. All of this conversation took place in English. Upon consideration of the conflicting testimony and the demeanor of the witnesses, I

find that defendant Tannous' testimony is not credible, and that he has an adequate understanding of English to comprehend the *Miranda* warnings. It is, of course, troublesome that the agents retained an interpreter upon arrival at DEA headquarters. In other circumstances this fact alone might raise an inference that the subject did not understand English. Here, however, I find that there is convincing evidence that Tannous had a substantial understanding of the language. That the agents may have been over-cautious or merely wished to facilitate communication does not outweigh this evidence. I further find that his conduct indicates a knowing and intelligent waiver of these rights. Accordingly, I rule that the defendants motion to suppress statements made in the vehicle to Agents Madden and Protentis be denied.

At DEA headquarters, the agents obtained the assistance of Mr. Sami Odeh, an independent consultant to the State Department as interpreter of Arabic. Odeh testified that he translated the *Miranda* warnings from a form into two dialects of Arabic: the classical dialect spoken in Egypt and the colloquial Lebanese dialect. He further testified that Tannous said he understood each right. When Tannous asked if he had to answer questions, Odeh told him, "It is up to you whether to answer or not." Subsequently, Tannous signed the waiver of rights form and proceeded to answer questions.

Defendant Tannous testimony on this matter is that he could not understand the interpreter because Odeh spoke with an Egyptian accent. Tannous also claimed that the interpreter induced him to sign the form by saying "I'll help you" and "It won't hurt you [to sign]."

Odeh, a teacher of Arabic, testified that he was born in the West Bank of Jordan and trained in the same dialect as Tannous. Odeh further testified that he had no trouble understanding Tannous, and that Tannous answered some questions in English before Odeh made the translation to Arabic. Odeh denied making any statement suggesting that Tannous sign the form and also testified that Tannous said he understood the *Miranda* warnings Odeh gave him in Arabic.

As previously ruled, Tannous' testimony is not credible, and I therefore find that events at DEA headquarters transpired as related by Mr. Sami Odeh, and that defendant Tannous expressly waived his Fifth Amendment rights prior to questioning. Accordingly, I rule that the motion to suppress statements made by the defendant at DEA headquarters be denied.

*Defendant El-DeBeib*

Milad El-DeBeib was first approached by Federal Agents in Boston at approximately 3:00 p.m. on the day of the arrests. He was subsequently arrested along with defendant Nakhoul in Cambridge after 4:00 p.m. and transported to DEA headquarters. Counsel for El-DeBeib has submitted, unsupported by memorandum, a motion generally aimed at suppression of all illegally seized evidence. For the purposes of this memorandum, the court now addresses the admissibility of post-arrest statements.

The uncontradicted evidence is, and I so find, that Milad El-DeBeib was advised of his *Miranda* rights on three separate occasions: by Agent Murphy when first confronted by the agents in Boston, by agent Venizelos after his arrest, and by Agent Meahl upon arrival at DEA headquarters. I further find that on each occasion El-DeBeib made a knowing and intelligent waiver of his rights.

Defendant has tendered no other theory which, if not rebutted by the government, would entitle him to the relief sought. Accordingly, I rule that El-DeBeib's motion to suppress be denied.

Order accordingly.