**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Kenneth Earl WHITE, Defendant–Appellant.**

No. 01–3866.

United States Court of Appeals,
Sixth Circuit.

June 5, 2003.

BEFORE: MOORE, and GIBBONS, Circuit Judges, and COHN, District Judge.*

COHN, District Judge.

This is a criminal case. Defendant–Appellant Kenneth Earl White (White) appeals from his jury conviction on two counts of felon in possession of a firearm, in violation of 18 U.S.C. § 922(g), for which he was sentenced to 160 months imprisonment. White presents four issues on appeal: (1) whether his statement to police should have been suppressed because he was not given proper *Miranda* warnings; (2) whether the evidence is sufficient to support his conviction; (3) whether a judgment of acquittal should have been granted; and (4) whether the district court gave confusing and contradictory jury instructions. For the reasons that follow, we affirm White's conviction.

## I. BACKGROUND

On January 11, 2001, a group of Ohio police officers began surveilling a known stolen car, a 1994 Chevy Blazer, located in an apartment parking lot. When officers approached the Blazer, they discovered it was unlocked. At that point, Officer James Amendolar, a Deputy Sheriff with the Stark County Sheriff's Department en-

* The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

tered the Blazer to hit the hood latch and open the hood. Amendolar then disconnected some wires to disable the Blazer. Officers did not observe any activity regarding the Blazer that day. The next day, January 12, 2001, an officer saw White enter the Blazer and attempt to start it, which of course was unsuccessful. When an officer ordered him out of the car, White again attempted to start the car and was again unsuccessful. White eventually exited the car and was arrested following a foot chase. Upon his arrest, Amendolar found two car keys and a remote in White's right pocket. One of the keys fit the Blazer. The other key belonged to a 1998 Lincoln Towncar, which was also stolen and located in the same parking lot. In addition, officers found a loaded .38 caliber Smith & Wesson in the glove box of the Lincoln, and a loaded .357 Ruger and .22 Harrington Richardson in the center console of the Blazer.

White pled guilty in Ohio state court to attempted theft of the Blazer. He was later charged in federal court in a 2 count indictment for being a felon in possession of a firearm. Count 1 related to the two guns in the Blazer and Count 2 related to the gun in the Lincoln.

White's theory at trial was that he only attempted to steal the Blazer and the evidence failed to show that he had actual possession of the guns sufficient for conviction. At trial, the government introduced two statements White made to Amendolar while in custody. The first statement was made on January 12, 2001, the day of White's arrest and after White was given his *Miranda* rights. White told Amendolar that he "went there to steal a car." Amendolar reminded White of the charges against him, at which point White said he wanted to "think about it" before he would talk any further. This statement was admitted at trial without objection.

Amendolar returned to speak with White three days later, on January 15, 2001. When White was placed in the interview room, Amendolar asked him if he had time to think about what they had talked about on the 12th. Amendolar then reminded White that he (Amendolar) had previously read him his *Miranda* rights, but did not re-*Mirandize* him at that time. White then told Amendolar that "when I checked inside of the Blazer, I should have found the keys and the guns in the console."

At trial, White's counsel objected to the admission of White's second statement. At side bar, the district court asked the government to clarify whether or not Amendolar had re-*Mirandized* White. Amendolar then testified before the jury that "he had a discussion" with White about his *Miranda* rights, reminding White that Amendolar had previously read him his rights on January 12th. Amendolar further testified that in response, White "just sat there and looked at me like he understood what I was saying." White's counsel again objected, which the district court overruled. Amendolar then testified as to White's second statement that the keys and the guns should have been in the console of the Blazer. After recounting White's statement, Amendolar testified that he then told White that the keys were in the ignition to the Blazer when White was arrested and were not in the Blazer prior to that time. At that point, White told Amendolar that he wanted to speak with an attorney and Amendolar ended the interview.

## II. ANALYSIS

### A. *Miranda* violation

We review a district court's factual findings for clear error and its legal conclusions *de novo. See United States v. Crowder,* 62 F.3d 782, 785 (6th Cir.1995). "The

courts have generally rejected a *per se* rule as to when a suspect must be readvised of his rights after the passage of time or a change in questioners." *United States v. Andaverde,* 64 F.3d 1305, 1312 (9th Cir.1995). This Circuit has applied a totality of the circumstances approach when addressing the issue of a delay between reading *Miranda* rights and a custodial interview, considering the following factors articulated in *United States v. Weekley,* 130 F.3d 747, 750 (6th Cir.1997) (citations omitted):

> (1) the time elapsing between arrest and arraignment of the defendant[;] (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession[;] (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him[;] (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel; and (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession.

█ Primarily at issue here is whether the *Miranda* rights given by Amendolar to White following his arrest were still in effect when White was interviewed by Amendolar three days later. Applying the above factors to the circumstances surrounding the White's second statement to Amendolar, we find that the district court properly denied White's request to suppress the statement. White was clearly aware of his rights on January 12th and understood those rights. He was questioned both times by the same police officer, who reminded him of his rights on the 15th. Although there was a three day delay between the questioning, the delay was largely due in response to White's request to have time to think about it. There is no evidence that anything affected White's understanding of his rights between the 12th and the 15th. Indeed, the fact that White asserted his right to stop the questioning and to speak with an attorney on the 15th demonstrates awareness of his rights. There is also no evidence of coercion or promises of leniency. In fact, Amendolar testified that White asked Amendolar whether speaking to him would help him, Amendolar replied that he could make a recommendation to the prosecutor but did not promise White anything. We also note that when White asserted his right to stop the questioning and speak to an attorney, Amendolar properly stopped the interview. In short, we conclude that White's second statement was voluntary and not obtained in violation of *Miranda.*[1]

## B. Sufficiency of the Evidence and Motion for Acquittal [2]

### 1.

"In deciding whether the evidence is sufficient to withstand a motion for an acquittal, and support a conviction, the court views all evidence in the light most favorable to the prosecution and determines whether there is any evidence from

---

**1.** White's second statement to Amendolar that he should have found keys and guns in the console of the Blazer might be considered a statement against interest but arguably is not really such a statement. The statement that keys and guns were in the console is not necessarily inconsistent with White's theory of the case—that he only attempted to steal the Blazer and as a consequence did not have possession of the guns inside of it. Although the government did not advance this argument, it is another reason why White's second statement need not have been suppressed.

**2.** Because White presents the same arguments for both issues, we have addressed them together in this opinion.

which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Talley,* 164 F.3d 989, 996 (6th Cir.1999). "[T]his court neither independently weighs the evidence, nor judges the credibility of witnesses who testified at trial. *Id.* (citations omitted) A sufficiency of the evidence challenge is reviewed to determined "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."" *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Allen,* 954 F.2d 1160, 1169 (6th Cir.1992).

### 2.

White argues that as to Count 1 (the two guns in the Blazer), there is no evidence that he possessed the guns. He was seen only entering the Blazer—empty handed—and exiting less than thirty seconds later. None of the officers who were surveilling the Blazer had searched it prior to White's arrest to know whether any guns were in it. Even his statement to Amendolar about guns being in the Blazer does not show White had possession of the guns sufficient for conviction. As to Count 2 (the gun in the Lincoln), White says the evidence is more tenuous. The only evidence, according to White, which connects him to the Lincoln is that he had the keys to it. White argues that officers also failed to assure that the gun was in fact in the Lincoln when the car was recovered and notes that the gun was found during an impound search.

In order to convict under § 922(g)(1), the Government must prove the following three elements: "(1) that the defendant had a previous felony conviction, (2) that the defendant possessed a firearm, and (3)

that the firearm had traveled in or affected interstate commerce." *United States v. Kincaide,* 145 F.3d 771, 782 (6th Cir.1998) (citations omitted).

■ White challenges only the sufficiency of the evidence that he possessed a firearm.[3] Evidence of constructive possession suffices to satisfy the requirement under § 922(g)(1) of proof that a defendant possessed a firearm. "Constructive possession exists when a person does not have actual possession but instead knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." *Kincaide,* 145 F.3d at 782. Proof that "the person has dominion over the premises where the firearm is located" is sufficient to establish constructive possession. *United States v. Clemis,* 11 F.3d 597, 601 (6th Cir.1993).

■ We find that the evidence at trial was sufficient to establish that White had constructive possession of the weapons that were discovered in the Blazer and the Lincoln. At trial, the government presented evidence that the Blazer and Lincoln were stolen during two burglaries occurring in November and December 2000. Richard Barry testified that on November 4, 2000, his Lincoln was stolen along with two car keys. Also stolen was his Ruger .357 revolver. Carl Russo testified that his Blazer and car keys were stolen on December 6, 2000. Although White was only seen attempting to drive off in the Blazer, he had keys to both cars on his person. Both Barry and Russo identified the keys found on White as the keys to their respective cars. Moreover, and perhaps the most incriminating evidence against White, is the fact that the .357

---

**3.** The parties stipulated that White is a convicted felon. The testimony of ATF Agent

Hopkins established that the guns traveled in interstate commerce.

Ruger found in the Blazer belonged to the owner of the Lincoln.

Although White attempts to make much of the fact that the Lincoln was not searched before White was arrested, the Lincoln was not searched because it was locked. Only after recovering the keys from White were the police able to search the Lincoln at the impound lot. As to the Blazer, although Amendolar entered the car and disabled it, there is no evidence that any of the officers acted inappropriately. To the extent that White argues the officers, or someone else, might have placed the gun in the Blazer, this argument lacks merit in light of White's statement to Amendolar that the police should have found guns in the Blazer. Drawing all reasonable inferences in favor of the government, we conclude that there was enough evidence for a rational juror to conclude that White had dominion and control over the guns found in the Blazer and the Lincoln.

### C. Jury Instructions

In his last assignment of error, White argues that the district court gave a confusing and contradictory instruction on the definition of knowingly. The government argues that the instructions given were standard instructions in these types of cases and notes that there was no objection to the instruction at trial.

On appeal, "[o]ur inquiry into jury instructions is limited to whether, taken as a whole, the instructions adequately inform the jury of the relevant considerations and provide the jury with a sound basis in law with which to reach a conclusion." *United States v. Wells*, 211 F.3d 988, 1002 (6th Cir.2000). "This court may reverse a judgment on the basis of improper jury instructions only if the instructions, when viewed as a whole, were confusing, misleading and prejudicial." *Id.* In addition, since White did not object to the jury

instructions at trial, our review is for plain error. *See United States v. Jones*, 108 F.3d 668, 670 (6th Cir.1997) (en banc); Fed.R.Crim.P. 52(b). Under a plain-error standard, we ask "(1) whether an error occurred in the district court; (2) if error occurred, whether the error was plain; (3) if the error was plain, whether the plain error affected substantial rights; and (4) . . . whether the plain error affecting substantial rights seriously affected the fairness, integrity or public reputation of judicial proceedings." *Jones*, 108 F.3d at 670. Only if all four of these questions are answered in the affirmative will we reverse the district court on the basis of erroneous jury instructions.

■ Here, the district court gave standard instructions on the crime of felon in possession of a firearm. White does not argue that the district court's instructions were wrong, but rather argues that under the circumstances of the case—where White admitted to trying to steal the Blazer—the instructions were confusing. Having reviewed the instructions for obvious error, we do not find them to be confusing or in any way prejudicial to White's case.

### III. CONCLUSION

For the reasons stated above, we AFFIRM White's conviction.

GIBBONS, Circuit Judge, concurring.

I fully agree with Judge Cohn's opinion in this case and write separately only to emphasize why the various case authorities support admission of White's second set of statements.

In her concurring opinion finding a *Miranda* violation, Judge Moore relies primarily on the lapse of three full days between the first and second interrogations. In her view, "[w]hile many cases uphold later interrogations on the basis of

an earlier *Miranda* warning when only hours separate the two ... few of them involve intervening periods of several days." Judge Moore distinguishes the cases involving intervening periods of several days noting that such cases "have often involved detailed 'reminders' to the defendants of their rights, and explicit statements by these defendants that they remember the initial recitation and understand their rights." I respectfully disagree with this analysis.

While federal courts recognize that a single *Miranda* warning may not always be adequate, the weight of federal case law supports the conclusion that White's second statements were voluntary and not obtained in violation of *Miranda. See People of Territory of Guam v. Dela Pena,* 72 F.3d 767, 770 (9th Cir.1995) (holding that the fifteen-hour interval between the *Miranda* warnings and the subsequent questioning did not render the defendant's confession inadmissible); *United States v. Andaverde,* 64 F.3d 1305, 1312 (9th Cir. 1995) (one day delay between interrogations found permissible); *Puplampu v. United States,* 422 F.2d 870, 870 (9th Cir. 1970) (finding that delay of two days between interrogations did not require additional *Miranda* warning); *see also Henne v. Fike,* 563 F.2d 809 (7th Cir.1977) (nine hour gap between warnings and subsequent waiver did not violated *Miranda* ).

In *Biddy v. Diamond,* 516 F.2d 118 (5th Cir.1975), the defendant received full *Miranda* warnings on December 15. *Id.* at 120. On December 27, the police decided to question Biddy again and asked her, "Do you understand your rights?" *Id.* at 121. Biddy responded that she understood. *Id.* This exchange did not involve a "detailed reminder" of *Miranda* rights. Rather, similar to the instant case in which the officer reminded White that he had read him his rights earlier, the reminder in *Biddy* was cursory. Furthermore, while the defendant in *Biddy* affirmatively stated that she understood her rights, White affirmatively demonstrated that he understood his rights by asserting his right to stop the second interrogation and speak with an attorney.

In *Martin v. Wainwright,* 770 F.2d 918, 930 (11th Cir.1985), *modified on other grounds,* 781 F.2d 185 (11th Cir.1986), the Eleventh Circuit relied on *Biddy* in determining that the defendant's second confession was not obtained in violation of *Miranda* even though the defendant waived his *Miranda* rights one week earlier and the police did not fully rewarn him of his rights. *Id.* at 930–31. While the police prefaced the second interrogation with a detailed reminder of *Miranda* rights, in reaching its conclusion the court relied on the fact that the defendant "was fully warned, and knowingly and intelligently waived his *Miranda* rights" and during the second interrogation he "indicated that he still understood those rights." *Id.* at 930. The same circumstances are present in the instant case.

The only federal case relied upon by Judge Moore which finds that an intervening period requires new *Miranda* warnings is distinguishable from the present case. In *United States v. El–Debeib,* 802 F.2d 442 (1st Cir.1984), the First Circuit affirmed without opinion the district court's finding that a one and a half hour delay between interrogations violated *Miranda.* In reaching its conclusion, the district court relied heavily on the fact that the defendant was a Lebanese man whom the court found to have a limited understanding of American law, customs, and constitutional rights. 596 F.Supp. 1398, 1402 (D.Mass.1984). The district court noted that the defendant was left alone in a small windowless room, was aggressively questioned by two unfamiliar agents who did not give him *Miranda* warnings them-

selves, and was upset, frightened, and weeping during the interrogations. *Id.* at 1401–02. The district court recognized that the defendant was read his rights earlier and that the defendant acknowledged his understanding of his rights at that time, but the court found it significant that there had been "no showing that [the defendant] understood that those same rights could be asserted during questioning by any law enforcement officer." *Id.* at 1402. In the instant case, there is no evidence that White's understanding of American law and customs is limited. Nor is there any evidence that the officer questioned White in an aggressive manner or that White was upset or weeping during the questioning. Furthermore, White was questioned by the same officer who read him his rights initially and there is evidence that White understood he could assert those rights at the later interrogation.

Finally, we must recognize the "totality of circumstances" in the present case, as mandated by *Weekley.* As explained in the majority opinion, White understood his rights during the first interrogation, knew the nature of the charges against him, was reminded of his rights during the second interrogation, was questioned by the same officer during both interrogations, and asserted his rights during the second interrogation. Moreover, the three-day intervening period between the interrogations was in response to White's request for time to think about his situation.

Based on the above case law and the lack of federal case law supporting a determination that White's *Miranda* rights were violated, White's second statements were voluntary and not obtained in violation of *Miranda.*

MOORE, Circuit Judge, concurring in part and concurring in the judgment.

Kenneth Earl White was interrogated by government officials on two different occasions that were separated by three days. Although the first interrogation was preceded by a constitutionally sufficient set of *Miranda* warnings, the second interrogation was not. The majority holds that the government's failure to readvise White of his constitutional rights did not impair the admissibility of the statements that White made during the second interrogation. I believe that the majority is incorrect in so holding. Nevertheless, though I conclude that White's statements should have been suppressed, I consider the error to be harmless. Agreeing with the majority's treatment of the other issues in the case, I concur in the judgment.

Under the test this court announced in *United States v. Weekley,* 130 F.3d 747, 751 (6th Cir.1997), I believe that White's second set of statements should have been suppressed. Three full days elapsed between the first and second interrogations. While many cases uphold later interrogations on the basis of an earlier *Miranda* warning when only hours separate the two—*Weekley,* for example, involved a one-hour delay, *see id.* at 751—few of them involve intervening periods of several days.[1]

There is clear support for the proposition that an excessive delay between an initial and subsequent interrogation can

---

**1.** The following quotation from a criminal procedure treatise accurately conveys the practice of the federal courts:

> It is generally accepted that fresh warnings are not required after the passage of just a few hours. Authority is also to be found to the effect that this is also true even after the passage of several days where the custody has been continuous, but the contrary view has much to commend it. Clearly the passage of weeks or months is too long.

Wayne R. Lafave et al., 2 *Criminal Procedure* § 6.8(b), at 574–75 (2d ed. 1999 & Supp. 2003) (footnotes omitted).

vitiate the effect of the *Miranda* warning given at the initial interrogation. Several courts have held to this effect. *See, e.g.,* *United States v. Nakhoul,* 596 F.Supp. 1398, 1401–02 (D.Mass.1984), *aff'd without op.,* 802 F.2d 442 (1st Cir.1986); *State v. DeWeese,* 582 S.E.2d 786 (W.Va.2003); *Ex Parte J.D.H.,* 797 So.2d 1130, 1132–33 (Ala.2001); *Commonwealth v. Wideman,* 460 Pa. 699, 334 A.2d 594, 599 (Pa.1975); *Scott v. State,* 251 Ark. 918, 475 S.W.2d 699, 701 (Ark.1972); *Commonwealth v. Doe,* 37 Mass.App.Ct. 30, 636 N.E.2d 308, 311 (Mass.App.Ct.1994); *People v. Bennett,* 58 Cal.App.3d 230, 238, 129 Cal.Rptr. 679 (Ca.Ct.App.1976); *Franklin v. State,* 6 Md.App. 572, 252 A.2d 487, 490–91 (Md.Ct. Spec.App.1969), *cert. denied,* 399 U.S. 912, 90 S.Ct. 2210, 26 L.Ed.2d 568 (1970). Several of these cases have held a *Miranda* warning stale after an intervening delay shorter than the one here. *See Nakhoul,* 596 F.Supp. at 1400 (an hour and a half); *Wideman,* 334 A.2d at 599 (twelve hours); *Franklin,* 252 A.2d at 490–91 (two days); *Doe,* 636 N.E.2d at 311 (two and a half days).

Moreover, those cases that have upheld delays of several days or more have often involved detailed "reminders" to the defendants of their rights, and explicit statements by these defendants that they remember the initial recitation and understand their rights. For example, the Eleventh Circuit once upheld a second interrogation that took place a week after the first. *Martin v. Wainwright,* 770 F.2d 918, 930 (11th Cir.1985), *modified on other grounds,* 781 F.2d 185 (11th Cir.), *cert. denied,* 479 U.S. 909, 107 S.Ct. 307, 93 L.Ed.2d 281 (1986). The second interrogation, however, was prefaced by the following statement from the interrogator: "I will remind you of your constitutional rights. You know that you don't have to talk to me. You have an attorney who says that he wishes for you to talk to no one but you're going to talk to me of your own free will and because you want to, is that correct?" *Id.* at 930. In response, the defendant answered, "Right." *Id.*

Here, in contrast, White never said, or otherwise signaled, that he understood his rights before the interrogation began. There was not even a cursory explanation (as there was in *Martin*) as to what those rights might have been. The interrogating officer, James Amendolar, simply told White that Amendolar had earlier read White his rights. White never responded to Amendolar's statement at all. According to Amendolar, White "just sat there and looked … like he understood what [Amendolar] was saying." J.A. at 164. Given these facts, and the fact that these interrogations apparently took place outside the presence of a lawyer while White was in continuous police custody, I believe the district court erred in not suppressing the statements White made at the second interrogation.

Nevertheless, although I conclude that it was error for the district court to admit White's statements at the second interrogation, I do not believe that reversal is required because I believe the error to be harmless. To determine whether the error is harmless in this context, one asks "whether, absent the improperly admitted [evidence], it is clear beyond a reasonable doubt that the jury would have returned a verdict of guilty." *United States v. Carnes,* 309 F.3d 950, 963 (6th Cir.2002), *cert. denied,* —— U.S. ——, 123 S.Ct. 1371, 155 L.Ed.2d 211 (2003). I think it clear here that White would still have been convicted had his statements been suppressed. Two factors support this conclusion.

First, as the majority notes, the admitted statements were not clearly harmful to White's case. *See* Maj. op. at —— n. 1. It is not as if White confessed to the crimes during the second interrogation. White

was merely asked where he got the keys to the Blazer, and he responded by saying that when the police checked the Blazer they should have found the keys (and the guns) in its console. This was perfectly consistent with White's theory at trial, where he claimed that he was trying to steal the Blazer and found the keys inside the car. Because the improperly admitted statements did not harm White's case in any way, it cannot be said that their exclusion would have helped him.

Second, the proof that the government elicited against White at trial is overwhelming. White claims that he was merely attempting to steal a car that was previously unknown to him. White's argument is that he just happened to attempt to steal a Blazer that had been previously stolen by someone who had recently also stolen a Lincoln, put the guns from the stolen Lincoln into the Blazer, kept both sets of keys in the Blazer, and left the Blazer unlocked. This is quite complicated speculation. Moreover, White's own actions belie his claim that he was unfamiliar with the Blazer. There was testimony that White "walked directly to that red Blazer," "didn't hesitate" to open it, and "wasn't in [it] no more than a couple seconds when he tried to start [it]." J.A. at 100 (Testimony of Officer Lancaster). This strongly suggests that White was familiar with the Blazer and with the guns inside it. Moreover, White must claim not only that he found the keys to the Blazer and attempted to start it in that brief span of time, but also that he found the keys to the Lincoln in the Blazer at that same time as well – for when White was arrested he was found with the keys to the Lincoln. Given the fact that White's theory of the case is utterly implausible and the fact that White's statements were actually not inconsistent with that theory, it becomes impossible to conclude that the jury could have found White innocent in the absence of the illegally obtained evidence. I therefore concur in the judgment.