**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

In re: PROFESSIONAL HOME
HEALTH CARE, INC., a Colorado
corporation,

      Debtor,

------------------------

PROFESSIONAL HOME HEALTH
CARE, INC., a Colorado corporation,

      Appellant,

vs.

COMPLETE HOME HEALTH CARE,
INC.; JUDY RUZICKA; BARBARA
CICCONE; DIERDRA DAUGHERTY;
HOLLY DAVIS,

      Appellees.

No. 04-1425
(D.C. No. 03-AP-2452)
(D. Colo.)

**ORDER AND JUDGMENT**[*]

Before **TACHA**, Chief Judge, **ANDERSON**, and **KELLY**, Circuit Judges.

Plaintiff-Appellant Professional Home Health Care ("PHHC") appeals from

---

[*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. This court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

the district court's order affirming a bankruptcy court's judgment in an adversary proceeding. Following a twelve day trial, the bankruptcy court entered judgment in favor of Defendants-Appellees, Complete Home Health Care ("CHHC"), and Judith Ruzicka, Barbara Ciccone, Dierdra Daugherty, and Holly Davis (collectively "individual Defendants"). In its complaint, PHHC claimed that the individual Defendants (1) breached their duty of loyalty, and (2) violated an employee Work Agreement when they resigned from PHHC and established a competing home health care company, Defendant CHHC. After hearing the evidence, the bankruptcy court rejected PHHC's claims. On appeal, PHHC argues that the bankruptcy court erred as a matter of law in rejecting its claims. Our jurisdiction arises under 28 U.S.C. § 1291, and we affirm.

Background

PHHC, a home health care provider, operated from six largely autonomous branch offices throughout Colorado. Aplt. Br. at 8. Individual Defendants Daugherty, Ciccone, and Ruzicka[1] were managers of distinct branch offices, with duties including: (1) hiring and firing of personnel, (2) negotiating with vendors, and (3) developing a network of agencies who referred patients to PHHC. Id. at 8-9. Defendant Davis was in charge of PHHC's financial operations and

_____

[1]Defendant Ruzicka was also the Executive Director of PHHC.

- 2 -

supervised the staff who maintained the books and records of the company. Id. at 9.

On March 1, 2001, PHHC filed a chapter 11 petition in bankruptcy. On March 27, 2001, PHHC filed its complaint against the Defendants, instituting this proceeding in the bankruptcy court. According to PHHC, its longstanding, profitable, and highly regarded home health care business was destroyed by a conspiracy among the individual Defendants.

First, PHHC claims that the individual Defendants violated their duty of loyalty by resigning *en masse* and without notice to PHHC. Apparently, the individual Defendants resigned on the same day and at the same time by faxing six identical two-sentence letters of resignation. Aplt. Br. at 2. Further, PHHC explains that this "coordinated abandonment" resulted in the "devastating financial and administrative consequences one would expect" following the resignations of PHHC's branch managers. Id.

Second, PHHC claims that the individual Defendants breached their Work Agreements by establishing CHHC, a competing company, within three days of resignation. PHHC explains that shortly after establishing CHHC, the Defendants were employing most of PHHC's former staff and that CHHC was serving hundreds of PHHC's former patients. Aplt. Br. at 3-4. Particularly, PHHC claims that the Defendants violated their employment contracts by soliciting each other

as co-workers and by "recruiting" PHHC's patients.  Id.

Discussion

When a federal court sits in diversity, it is required to apply the most recent applicable substantive state law where pronounced by the state's highest court. Mincin v. Vail Holdings, Inc., 308 F.3d 1105, 1108 (10th Cir. 2002).  In this case we are required to apply Colorado law.  When reviewing challenges to bankruptcy court decisions, we utilize the same standard of review as the district court.  In re Hodes, 402 F.3d 1005, 1008 (10th Cir. 2005).  We evaluate issues of state law de novo, without deference.  Salve Regina College v. Russell, 499 U.S. 225, 238-39 (1991); Roberts v. Printup, 422 F.3d 1211, 1215 (10th Cir. 2005).  Therefore, we review a bankruptcy court's conclusions of law de novo, and that court's findings of fact are subject to a clearly erroneous standard.  In re Hodes, 402 F.3d at 1008.

A.    Breach of Loyalty

PHHC first claims that the individual Defendants breached their duty of loyalty by "recruiting" each other to leave the company and thereafter forming Defendant CHHC as a direct competitor.  The individual Defendants, on the other hand, argue that they were protected by a legal privilege to prepare and make arrangements to depart while still employed by PHHC.

Under Colorado law, an employee breaches her duty of loyalty if she

solicits other employees to terminate their employment. Jet Courier Service, Inc. v. Mulei, 771 P.2d 486, 497 (Colo. 1989). In Jet Courier, the Colorado Supreme Court adopted the Restatement (Second) of Agency's test for determining when a breach of loyalty arises. See id.; see also Restatement (Second) Agency § 393. As such, courts should focus on the following factors in determining whether an employee's actions rise to the level of a breach of loyalty: (1) the nature of the employment relationship; (2) the impact or potential impact of the employee's actions on the employer's operations; and (3) the extent of any benefits promised or inducements made to co-workers to obtain their services in the competing business. Jet Courier, 771 P.2d at 497. No single factor is outcome determinative. Id. In applying the test, courts must analyze the "nature of an employee's preparations to compete to determine if they amount to impermissible solicitation." Id. The solicitation's effectiveness is irrelevant. Id.

Employees do enjoy a privilege which enables them to prepare or make arrangements to compete prior to leaving the employ of their future competitors. See id. at 493, 497 n.13 (quoting Restatement (Second) Agency § 393, cmt. e). The nature of such preparations is crucial in determining whether a breach of loyalty has occurred. Id. at 497; see also Koontz v. Rosener, 787 P.2d 192, 195-96 (Colo. Ct. App. 1989). In fact, the Colorado Supreme Court has held that this approach should be applied flexibly, because certain traditional actions taken by

- 5 -

departing employees (e.g., an executive leaving with a secretary, a mechanic leaving with an apprentice, a firm partner leaving with associates) are not considered sufficient to constitute a breach of the duty of loyalty, absent an intent to injure the employer. Jet Courier, 771 P.2d at 497 n.13. A breach of the duty of loyalty requires more – and would only occur where the nature and extent of any solicitations compel such a conclusion. Id.

The Restatement provides that "a court may find that it is a breach of duty for a number of the key officers or employees to agree to leave their employment simultaneously and without giving the employer an opportunity to hire and train replacements." Restatement (Second) Agency § 393, cmt. e. A court must balance these factors, and the two competing public policies undergirding them,[2] in order to determine whether a breach of loyalty lies against the former employee.

According to PHHC, the bankruptcy court erred in finding that the individual Defendants breached their duties of loyalty in three ways: (1) the bankruptcy court did not understand that PHHC was claiming that individual Defendants solicited *each other* improperly; (2) the bankruptcy court did not understand that the effect of the *en masse* resignation severely damaged its

_____

[2]The Jet Courier court noted the conflicting policies of requiring honesty and fair dealing between employee and employer, as well as that of promoting free and vigorous competition. Jet Courier, 771 P.2d at 493.

economic viability, and therefore, constituted a paradigmatic instance of breach of loyalty; and (3) the bankruptcy court took into account irrelevant facts in arriving at its decision.  Aplt. Br. at 16-27.  We address each argument in turn.

With regard to the first argument, PHHC is simply wrong that the bankruptcy court erred by failing to take into account its claim that the individual Defendants breached their duties of loyalty by soliciting *each other*.  In reality, after considering the evidence, the court found that the individual Defendants did not improperly solicit each other because they were protected by the legal privilege entitling them to make career preparations after departure from PHHC.  Further, the bankruptcy court found no evidence whatsoever that any other PHHC employees were offered anything by the Defendants as an inducement.

With regard to the second argument, the bankruptcy court directly addressed the *en masse* nature of this resignation, and found that the individual Defendants were at-will employees, who were not motivated by any ill-will towards PHHC, and who believed that their "tasks could be assumed by subordinates who were positioned to take over."  Aplt. App. at 69.

This finding is amply supported by the record.  In an official written response to a governmental agency's set of sanctions, Ms. Bellinger (PHHC's principal) stated that, except for two employees, "all of the staff who resigned . . . were replaced within two or three weeks."  <u>See</u> Aplt. Supp. App. at 1591.

PHHC's internal documents suggested that those directly below the departed managers assumed their responsibilities and performed excellently. Id. at 1590-91. Lastly, according to a former PHHC employee who testified at trial, Ms. Bellinger herself called the individual Defendants' resignations a "gift" to PHHC – as the corporation had been contemplating discharging some employees for financial reasons. Aplt. Supp. App. at 3683. The bankruptcy court was not required to adopt PHHC's contrary view of the facts.

Third, PHHC argues that the bankruptcy court took into account "irrelevant facts" in arriving at its conclusion that the duty of loyalty had not been breached. For example, PHHC faults the bankruptcy court for considering the reasons advanced by the individual Defendants for resigning including PHHC's financial condition and regulatory problems. In this same vein, PHHC also argues that (1) the motives of the Defendants were irrelevant, (2) the Defendants' beliefs that other PHHC employees would take over their resigned duties were irrelevant, and (3) the *en masse* nature of the resignation was not justified based on the fact that the Defendants were at-will employees.

We think that the bankruptcy court could consider these matters under Jet Courier's flexible approach, and we do not read the bankruptcy court's decision as holding that a breach of the duty of loyalty requires a finding that the departing employees acted with a bad motive. Rather, the bankruptcy court heard the

evidence and obviously credited the individual Defendants' view of the situation. The bankruptcy court recognized that PHHC had a strong case before its principal, Ms. Bellinger, was cross-examined and the individual Defendants explained their actions and PHHC's operations. After that, however, the bankruptcy court chose to believe the explanation advanced by the individual Defendants and apply the Jet Courier factors. This is a perfectly permissible exercise of the fact-finding function. The district court's legal conclusions flow from its factual findings.

B.     Violation of Work Agreement

PHHC argues that the individual Defendants breached their Work Agreements by recruiting patients to the new company, CHHC. In addition, PHHC disputes the bankruptcy court's conclusion that the provision of the Work Agreement allegedly breached by the individual Defendants was ambiguous. Aplt. Br. at 27-32. According to PHHC, the bankruptcy court incorrectly accepted parol evidence to aid in the determination of the contractual provision's meaning. Id. The individual Defendants, on the other hand, argue that the contractual language restricts employees during employment and for 180 days thereafter from only a single pattern of conduct – soliciting a PHHC client into leaving PHHC and then going to work privately for the client.

The interpretation of a contract under Colorado law is a legal question.

Grant v. Pharmacia & Upjohn Co., 314 F.3d 488, 491 (10th Cir. 2002); Fibreglas Fabricators, Inc. v. Kylberg, 799 P.2d 371, 374 (Colo. 1990). Whether a contractual term is ambiguous is also a question of law. Grant, 314 F.3d at 491; Pepcol Mfg. Co. v. Denver Union Corp., 687 P.2d 1310, 1314 (Colo. 1984). If a contract is ambiguous, thus allowing the introduction of external evidence to determine the contract's meaning, "then interpretation of the contract becomes a question of fact." Stegall v. Little Johnson Assocs., Ltd., 996 F.2d 1043, 1048 (10th Cir. 1993).

The individual Defendants signed an employment agreement while working for PHHC. This agreement contained a limitation on the scope of work they could undertake both while employed and for 180 days following separation from PHHC. The Work Agreement provides, in pertinent part:

> In consideration for [PHHC's investment in me as an employee] I agree during my employment, and during the 180-day period of time after my employment ends with [PHHC]
> • to not recruit clients to leave this agency, and
> • to not work privately for the agency's clients.

Aplt. App. at 254.

According to the bankruptcy court, regardless of whether the meaning of the provision was interpreted according to PHHC's view (i.e., that any solicitation of PHHC clients was restricted for 180 days after termination of employment), or according to the individual Defendants' view (i.e., that it restricted client

- 10 -

solicitation only in connection with private pay work while still employed by PHHC), PHHC failed to provide direct evidence of a breach of the contract by the Defendants. Aplt. App. at 71-72. We agree.

PHHC argues that the bankruptcy and district courts adopted a meaning of "recruit" that was overly narrow. Aplt. Br. at 32-36. According to PHHC, recruitment can be either direct or indirect. PHHC cites numerous cases for this proposition, although rather peculiarly, none apply Colorado law. Aplt. Br. at 34 n.12. The individual Defendants, meanwhile, argue that under Colorado law, recruit implies "actively initiated contact." Atmel Corp. v. Vitesse Semiconductor Corp., 30 P.3d 789, 793 (Colo. App. 2001). The dictionary definition of "recruit" means "to secure the services of . . . [or to] enlist new members." Webster's Collegiate Dictionary 985 (9th ed. 1991). As such, the construction of "recruit" most likely correct under Colorado law requires a direct request or plea. Atmel, 30 P.3d at 793.

Regardless of whether "recruiting" can be indirect as well as direct, though, PHHC simply did not provide evidence that the individual Defendants violated the Work Agreement by recruiting PHHC's patients to CHHC. PHHC argues that it presented "direct evidence that defendants had recruited at least 47 specifically-identified patients among the hundreds of PHHC patients who transferred their

care to CHHC."[3]  Aplt Br. at 33.  PHHC argues that due to the nature of the relationship between the individual care provider and the patient, the recruitment of PHHC individual health providers resulted in the indirect recruitment of PHHC's patients, because if the provider left PHHC to go to CHHC, so would the patient.  Aplt. Br. at 35.  In essence, PHHC argues that it defies logic to claim that the spontaneous migration of so many PHHC clients to CHHC could occur absent recruitment.  Unfortunately for PHHC, this logic cuts both ways.

First, PHHC had serious financial and regulatory difficulties, some of which precipitated the individual Defendants' very departure.  Second, in the time following the individual Defendants' resignations, PHHC was struggling to retain patients and employees.  As PHHC has argued, the relationship between the individual care provider and the patient is much stronger than that between the

---

[3]While PHHC contends the bankruptcy court ignored this "evidence," our independent review of those citations identified by PHHC as providing "direct evidence" of CHHC's recruitment of PHHC patients has not revealed anything more than the names of patients who transferred from PHHC to CHHC and the fact that those patients had nurses at PHHC who transferred to CHHC.  See Aplt. App. 797-865.  PHHC does not point to testimony indicating that former PHHC employees recruited those patients to come to CHHC.  Indeed, all three of the former employees – two nurses and one personal care coordinator – that PHHC relies upon to support its theory actually testified to the contrary.  Aplt. Supp. App. at 3693, 4301, 4360-61.  Further, PHHC's characterization of this situation, viz., that these nurses worked only for PHHC and then began working solely for CHHC, completely misstates the record.  Both nurses explicitly testified that they were working for multiple agencies the entire time, which makes sense when we realize that they were *temporary* employees.  Aplt. Supp. App. at 4295, 4355-56.

home health care provider and the patient. As such, it makes perfect sense why the patients departed with their individual care providers, some to CHHC and some elsewhere. Indeed, as the bankruptcy court noted, the fact that PHHC is unable to come forward with any direct evidence contradicting the individual Defendants' testimony that they did not solicit PHHC's patients fully supports its finding that PHHC failed to prove *any recruitment* – direct or indirect. As such, PHHC's argument to the contrary is without merit.[4]

AFFIRMED.

Entered for the Court

Paul J. Kelly, Jr.
Circuit Judge

---

[4]Therefore, the questions of (1) whether the contractual provision is ambiguous or not, (2) whether the contractual provision proscribes direct and/or indirect recruitment, or (3) how, absent recruitment, so many former PHHC patients ended up at CHHC, need not be addressed because the lack of any evidence that the individual Defendants recruited any of PHHC's employees or patients leads to the conclusion that there was no breach of the Work Agreement.